The first case this morning is in Re Spirits International. Mr. Leverich? Good morning and may it please the court. My name is Bingham Leverich and I'm appearing on behalf of Appellant Spirits International or SPI. The ultimate issue in this case is whether the Trademark Trial and Appeal Board correctly refused registration of the mark Moskovskaya for vodka on the ground that it is primarily geographically deceptively misdescriptive under Section 2E3 of the Lanham Act. This court held in in Re Innovations that a mark may be refused registration on that ground only if three conditions are met. First, the primary significance of the mark must be a generally known geographic location. Second, the consuming public must be likely to believe that the place identified by the mark indicates the origin of the goods bearing the mark when in fact that is not the case. And third, the geographic misrepresentation must be a material factor in the consumer's purchasing decision. But what would happen in a case like this? Let's assume that the vodka was originally made in Moscow. I beg your pardon? Let's assume that the vodka was originally made in Moscow so there's no geographic deception at the outset. But then the mark is registered for a vodka and then the producer moves the place of production to Dover, Delaware. And what happens then is then there's a potential for a proceeding to cancel the mark? Yes, I think there would be a potential for a proceeding certainly by another manufacturer of vodka who wished to use that mark, could seek to cancel it or wish to use a confusingly similar mark. And your point here is that because it's not made in Dover, Delaware, because it's made in another Russian city, based on the survey, the fact that it's made in this other Russian city is not material. Do I understand that correctly? Absolutely. It's not material, Your Honor, and also the survey shows that only six out of the 231 respondents even believed that the vodka came from Moscow in the first place. So they weren't deceived. The great vast majority of them were not deceived at all. The six who said that they did think it came from Moscow also said that they would not be any less likely to purchase it if they learned that it came from Kaliningrad. In fact, if you look at all 231 respondents, there were only 11 out of all of them who said that they would be any less likely to purchase it if it came from Kaliningrad. And none of those 11 mentioned Moscow or in any way indicated that their desire would be less if they knew it came from Kaliningrad had anything to do with Moscow. What's the relevant consumer in this that the test is to apply to? The relevant consumer, Your Honor, I believe is all consumers of vodka. Those who, and this is the screening that was done for the survey was for people who purchase vodka in the last three months or may do so in the next three months so that you have all consumers of vodka and potential consumers of vodka is the relevant group or the relevant universe in our view. Isn't it appropriate to consider the Russian speaking public as well if the Russian speaking public is an appreciable segment of the American public? Our view, Your Honor, is that it certainly is appropriate to consider them and they are part of the entire market of vodka consumers, but that it is not appropriate to consider them separately. According to the record, there are 706,000 Russian speaking people in the United States. They constitute 0.25 of 1% of the population. If we roughly assume that the same relative percentages apply to vodka consumers, but you've got bad luck. You've got the only federal judge who speaks Russian. But the first five letters of Moskovskaya and Moscow are the same. After all, it's vodka, which is very heavily identified with Russia. So wouldn't a ordinary consumer that you're asking us to consider, even if not a Russian speaker, be cued to recognize Moscow in Moskovskaya? Well, one might think so, but our consumer survey was designed to test. That was one of the very things that was designed to test whether ordinary American vodka consumers, whether they include Russian speakers or not, whether they would recognize that Moskovskaya somehow relates to Moscow. Well, you could say that you can interpret those results to suggest that about 10% or actually over 10% did think that it came from Moscow. You could and the board did, but we would respectfully submit that that would not be correct because the 18 who get you to 10% did not say that they thought the vodka came from Moscow. They said they thought it came from Russia, which it does. They mentioned Moscow or Moscow or Moscow in response to a follow-up question, I believe, what makes you think so? But when probed, they never came back and said they thought it was actually made in Moscow. Further, those 18, all of them, as well as the six who would not be any less likely to purchase the vodka if they knew that it came from Kaliningrad. But the fact that they immediately associated the vodka with Russia is a pretty small step to get from there plus the first five letters to Moscow. Well, your honor, the fact, if the fact that they a relevant factor, then there's nothing deceptive about this mark because the vodka does come from Russia, comes from Kaliningrad in Russia. And if an answer Russia gets you to the point where... You know where Kaliningrad is? It's in what used to be East Prussia. Yes. And under German rule, and now it's been back to Russia. But it's quite a good distance away from Moscow. So the fact that there were a lot of people, a lot of the respondents did answer Russia, that's very true. But if that is enough to show that they associate the vodka with Moscow... How many of those would have known where Kaliningrad is? Well, the... Known that it's segregated from the rest of Russia by Poland, at least. The survey question was, I believe, your honor, that would your decision be affected if you learned that the vodka came from a Russian city named Kaliningrad? So it did let them know. I'm questioning whether it's Russian in the way most consumers would think of Russia. Well, Kaliningrad actually... We don't have to go into the history of Peter the Great. I'm aware of it. But Kaliningrad is one of the three largest exporters of vodka from Russia. And that was set forth in another of the TTA, the opinions that we believe was wrongly decided. If 2.6% were misled about this, why isn't there an interest in protecting that 2.6% from being misled? Well, your honor, I guess my answer to that is that in trademark law generally, the most of the cases come up under whether there is a likelihood of confusion. That's not the issue here. No, it's not. But it is the same in that the issue is whether consumers are being misled into thinking that somebody who has... I'm not sure that that's the same issue. Likelihood of confusion, you can tolerate some risk that a small proportion of the population being misled are confused about it. But where you're talking about the thing being geographically deceptive, I mean, even if 2.5% are misled by it, well, why isn't that significant? I mean, it seems to me potentially quite different from the likelihood of confusion case. Well, I guess I have to respectfully disagree with you. It seems to me it is significant for consumers not to be misled in the sense of the likelihood of confusion cases where they think that product X is actually made by Procter & Gamble or somebody when in fact it isn't. That's a significant type of confusion or deception. I don't see how the deception is any more significant if they are misled to believe that it comes from one country than another. Seems to me those are comparable. And the law, there's no case that I'm aware of under the likelihood of confusion test that finds that 2.4% of the survey is anywhere near enough to make the case. Is it your position that the consuming public should be considered as a whole in the sense that the portion or segment of the public that speaks the language in question should be ignored because it's just a small percentage? No, Your Honor. Our position is that yes, the relevant public is our consumers of vodka as a whole. Which would include Russian-speaking consumers of vodka as well as many others. The trademark law in terms of the surveys, which I've done quite a few of them, they basically you look at what is the relevant universe. The relevant universe is all consumers of the particular product in question. And then you test what those are. The law does not say, and I'm not aware of any case that says this, that if you have a particular group of consumers who may be either less likely or more likely to be confused by something. For example, someone who is colorblind, people who are colorblind, people who are blind, people who are deaf, people who are mentally challenged. Some of them may be more or less likely to be confused by a particular mark, but the law does not separately test for them. And I don't think likewise, there's no reason why you should test, separately test here all Russian speakers. But wouldn't that have the effect of, in effect, nullifying the foreign equivalence doctrine? In effect, you would have a survey of the general public in virtually every case, because in almost every situation where you're talking about foreign speaking peoples, you're only talking about a relatively small segment with few exceptions. But here, it's our view that the doctrine of foreign equivalence under this court's case does not apply at all, because the test that the court set here in that case is whether the ordinary American purchaser would stop and translate a word. The trademark trial and appeal board... In that case, though, in Palm Beach or Palm Bay, the mark was somewhat obscure. The mark was somewhat obscure compared to Moskovskaya, which, because of the significant presence of the letters spelling the word Moscow, that it's a different situation. Well, I agree that Verve is obscure to most Americans, but the survey showed that Moskovskaya was pretty obscure to most Americans. But I don't think, with respect, Your Honor, that it makes any difference whether it's more or less obscure, because the test that this court came up with there to be applied generally was whether or not the ordinary American purchaser would stop and translate. And what the board has done is, unilaterally, they have said, oh, what that really means is the ordinary American purchaser who speaks the foreign language. And the board then went on and... Forgive me for interrupting, but didn't the board really say the ordinary American purchaser, which includes... No, it didn't. Isn't that what they intended? Or isn't that the appropriate way to look at it? The American public does include that segment that speaks the language. I totally agree that if they said, which includes the foreign speakers, I would be totally with them. But that isn't what they said. They said, in this case, it is the Russian speakers. And they then went on and injected that modification of this court's decision in Convay into the California Innovations Test. And they found that the relevant public from which you must decide whether or not the three conditions are met are the speakers, the consumers who speak Russian. But is the effect of your argument that you would distinguish between a Russian language situation and a Spanish language situation because such a large proportion of the American public speaks Spanish? No, I mean, in terms of the rule that would be applied, I think the same rule would apply. The question is whether the average American consumer would be like... What percentage has to be deceived before you say that the mark can be refused registration? You said 2% wasn't enough, 2.5% wasn't enough. What percentage isn't enough? In the case, to take your case of the Spanish speaker, and we all know that there are many more Spanish speakers in this country. And if you surveyed the vodka population or some other population that Spanish, some other drink that Spanish people might be more likely to be familiar with, my guess is you would get a higher percentage of that total group knowing, understanding what the mark was. Okay, so what percentage becomes the problem? In my view, it would still be the same and the only guidance we have... What percentage is a problem? You say 2.5% is not a problem, 2.25% is not a problem. What percent is a problem? As we pointed out in our briefs, there is only one case that they have cited and that is cited in McCarthy that has found that... I know, but what do you think? Try to answer my question. My question is, what percent is a problem? What's the threshold? I would think that around 15%. So if it's more than 15%, it's geographically deceptive. If it's below 15%, it's not. That's a rule of thumb, a guideline, Your Honor, that the courts have gone with. But generally speaking, in fact, most of the courts in McCarthy say that in a survey, you need roughly 20% to show a likelihood of confusion. And there's only one case that has found less than 11% enough to show a likelihood of confusion. So I think that 2.4% or 2.6% is way below anything we've ever seen. And in my view, is not enough. I think you have the tail wagging the dog here. If you have 0.25 or 1% of the U.S. population, if they are the group that you have to look at to determine whether or not a mark is geographically deceptive, then that's a very small proportion. And because that small group might be misled by a mark, you would be disqualifying a great many foreign language marks from use by individuals and businesses. Would you like to save the... Well, actually, you've consumed your time, Mr. Leverage.  And if you'll give Mr. Shaw an extra seven minutes if he needs to use it. Thanks. Thank you. May it please the court. Thomas Shaw on behalf of the director of the USPTO. The problem with the test that Spirits puts forth is that it would exclude from the protections of the Lanham Act anyone in this country that doesn't speak English as a first language. And the Lanham Act is designed to protect all consumers and business from deceptive trade practices. And by doing so, they would carve out non-English speakers as a class. But you seem to use, the PTO seem to use the test, the ordinary U.S. consumer who is familiar with Russian, would they stop and translate? Is that the test that they put forward? The test as put forth in Palm Bay, as this court knows, is... Ordinary U.S. consumer, period. Yes, who would stop and translate. But I think the term would is a very important term because the presumption there is that if you would translate a term, you have to be able to speak the language. The test isn't whether the ordinary consumer could stop and translate. You speak the language, but the test as you're formulating it presupposes the answer. If you speak Russian, you automatically translate. And so in every instance, you presuppose the answer. Well, as... The ordinary U.S. consumer is going to stop and translate and recognize the meaning. And therefore, you've got a deception problem. Actually, no, because as this court noted in Palm Bay, it's not an ironclad rule. You don't apply it in every case. There are instances where there's something about the term itself that defies translation. The term itself might be particularly obscure, for example, or it might be a term that it doesn't have a direct and equivalent translation, which was the issue in the Sarkley case with the term repoussage. So there are instances where the doctrine will not apply simply because there's something about the term that defies translation. Why can't we just rely on what I think Palm Bay said? It's just the ordinary U.S. consumer. And to the extent that includes a few of us Russian speakers, they'll be included in the mix. Well, you certainly could. The problem with that is that it becomes a question of demographics because you may have the 700,000 Russian speakers, but of course, they're going to be spread throughout the population. So you water them down by looking at it in a mathematical sense. Don't you give them disproportionate importance if you require the test to be administered only to those who are familiar with and would translate it into Russian? Suddenly you've made the whole test center on 0.15% or 0.25% of the population. Well, again, the purpose of the Lanham Act is to protect consumers and business from deception. So that consumers as a whole, though, not 0.25%. True, but would you agree? Judge Rader's hypothetical. Let's put aside the foreign equivalence thing. Just say it's not a foreign language problem. The question is, what portion of the consumers was misled? And if you found that only 0.25% of the consumers were misled in a particular case, wouldn't that be such a low number that you wouldn't find that it was geographically deceptive? Well, 0.25% of the consuming population is still millions of Americans. No, no, but what's the answer to my question? Is there some threshold? And apparently in the likelihood of confusion cases, the PTO has assumed that something, let's say under 10%, is too small a percentage to be concerned about. Is the same thing true in geographic deception, so that there's some percentage below which we're not concerned? Logically, there must be, because there are certain languages that are so obscure. Forget about languages. Forget about languages. I'm just talking general. Now, if there's a survey that shows that only 2% of the people are confused by a particular geographic notation, and that 98% of the people are not confused, is there a geographic deception problem under those circumstances? I think there still is, because you still have a large portion, a large group, not a large portion, but a large group of the population that's going to be confused. And the problem is, it's not that the other 98% aren't confused. It's that they don't understand the term. Once they're told the meaning of Moscow, then they might still be confused. You keep coming back to the foreign equivalent problem. I'm saying put that aside. Let's assume that there's no translation problem, no language issue. And the question is whether the particular mark is geographically deceptive. But only a very small part of the population finds it to be deceptive. I mean, under those circumstances, you'd allow registration of the mark, wouldn't you? I believe so, yes. Why should it be different that we're in the foreign language area? Why should there be a different test? Why shouldn't there be the same notion that there's a sufficiently small part of the population that we shouldn't be concerned about? I think you could make an argument that it should travel over. But in this case, we have 700,000 people at a minimum who would be confused. There may be some de minimis level where the office would simply say, well, you're right, no one's confused about the term. We had a case, the Office of the Solicitor had a similar case, the Kempton Hotel case, where the term Hotel Monaco was found not to be misdescriptive after the office did a survey with that party, and we withdrew the case from the Eastern District, and we let the case go. So if it is de minimis, where we really can show that there aren't any people that would be confused, the office, I think, would withdraw that. But doesn't your test as you're administering it kind of add a geographic component to the test? If you administer this test in Brighton Beach, you get 60% of people who are confused as to the origin of the product. If you do it in Arizona, I don't think you even get your 0.25%. So haven't you, with your test that presumes that the ordinary U.S. consumer is familiar with Russian, haven't you introduced a geographic bias into your test? No, it's not really our test. I think that if you look back at the formulation of the test, going back to some of the older cases, back in the 30s, the Northern Paper case, it says that foreign words from common languages are translated into English to determine registrability. So the presumption is that if it's a common or modern language, then you make the translation unless there's some reason not to, which then gets you into the would-stop-and-translate rule. But, for example, I believe that in the Weiss noodle case, Hungarian was found to be a common modern language. And that's certainly more obscure than Russian is in terms of the number of speakers in this country. So I think that the issue is, is it a common language that American consumers, and American consumers are a very diverse group, literally from around the world, we're a nation of veterans, and that as a result, you're going to get a large number of people that are going to speak the language. As a percentage of the population, they may not be large, but there are a number of significant groups that each are a fairly large number, just not as a percentage of the population. Suppose the vodka here were called Moscow vodka, and the question is whether that was geographically deceptive. And there was a survey, and it showed that only 1% of the people thought that Moscow vodka actually came from Moscow. Would that be geographically deceptive? I think if the survey showed that the people, let me understand this right, if the survey showed that Moscow vodka didn't come from Moscow. Right, didn't come from Moscow. Yeah, I think. But people weren't misled. They didn't think that naming it Moscow vodka really meant that it was from Moscow. But only a tiny portion of the people thought that that meant that it came from Moscow. Well, that would go to the second element of the California Innovations Test, whether the place is known for... Well, let's assume that it's known, but the survey shows that most people don't make that association by looking at the label Moscow vodka.  Well, then I think you would have conflicting evidence in the record, because you would have evidence presumably that Moscow is known for vodka, and then you would have a survey that shows that apparently Americans think it's not known for vodka, and then I think it would be up to... No, I don't know that that's what the survey would show. The survey would show that by naming it Moscow vodka doesn't mean that they think it comes from Moscow. Well, in that case, I guess it goes to the third element, which is materiality. Yeah, I suppose it's only 1% think that the vodka actually comes from Moscow. Well, in California Innovations, the court said that if a place is known for a particular product, it's renowned for a particular product, that that will support a presumption of materiality to the consumer. That is, if a place is well known for it. And I think that one of the problems with the survey in this case is that the answers seem to be all over the place. Is that the one thing it showed is that American consumers really don't know much about Russian vodka. There was one respondent thought it came from Italy, and so there's an enormous variation in the results of the survey. You rejected the mall intercept survey because you thought it was not representative of the U.S. consumer. Why isn't it? Well, a number of cases have held that mall intercept surveys are not truly random surveys, that the mall population is somehow a self-selecting population, either through demographics or location. Most malls seem to be in suburbia. And some of the authorities, although the cases we cited in our brief, say that it's not truly a random sample, and therefore can't be extrapolated out across the population. How can you get a random sample? Well, I think some of the other surveys have, for example, they've done telephone surveys where they call... There's a huge proportion of the population that has cell phones. You're not allowed to call people with cell phones to do surveys, and a lot of people with landlines these days refuse to answer. So I don't know what the basis for thinking that a mall survey is less accurate than that kind of telephone survey is. And I agree, Your Honor. I think that part of the problem with the board's finding was that because of the fact that the survey didn't screen for Russian speakers, you didn't really get a sense of what the knowledge level of the population was to begin with. And I think that the mall factor was one of many factors that the board had in finding that the survey wasn't probative. I think for the board, the big issue was the fact that it didn't screen for Russian speakers and that there was a dispute about the proper tabulation of the results. So you agree that if they were wrong about screening for Russian speakers, the survey was probative? I think if the survey had screened for Russian speakers, at least you'd have a better sense of what the consumers knew about the mall. I mean, at the end of the... Do you agree it would be probative if we reject the screening for Russian speakers? No, again, because I think there were other issues with the survey. What's the other issue? Well, for example, on the materiality issue, the survey didn't actually ask about whether the consumer thought that the goods came from Moscow. It asked whether it would be material if they came from Kaliningrad, which is another city that's also well known for vodka. So the board found that was essentially sort of a loaded question because to ask consumers if they thought it was material to come from Kaliningrad, which is known for vodka, doesn't really address the issue of, in this case, which is Moscow or Moscow, Skya. Unless there are any more questions, I'll waive the remainder of my time. Thank you, Reverend. All right, Mr. Leverich. Yes, just quickly on that. You have four or five minutes. Thank you. On that last point, the point that the board made that it was a loaded question to ask the respondents whether their decision would be affected if they knew that the vodka came from Kaliningrad. And the board said that instead, they should have been asked if their decision would be affected if the vodka came from Dover, Delaware, or someplace that was less known for vodka. What is the standard for foreign equivalents that we should apply? Do we always translate them or do we just translate them when it's a significant portion of the American population? I would say the latter, but I would adopt, right now, the law, Your Honor, is, I believe, what you stated in the Palm Bay case. That is, it should be applied when the ordinary American purchaser would stop and translate it, not when the ordinary American purchaser who speaks the language would stop and translate it. There's nothing in the decision about that. It should be the ordinary American consumers. And there are words, foreign words, which ordinary American consumers... Cerveza Mexicana, is that registrable? I don't know, because I don't know. You're going to get a large percentage, better than 15% of the U.S. population is going to identify something dealing with Mexico with that, right? I would assume so. And if you had a survey that showed 15% taken from the entire universe of purchasers of the product in question didn't translate it, you'd be getting close, at least, and probably would have a case. But I think that this court tried in Palm Bay to lay down a bright line as to when you do and when you don't invoke the doctrine. And that was whether the ordinary American purchaser would translate it. Now, if you look at the label on this, it says in bold letters at the bottom, Russian vodka, Moskovskaya. Wouldn't the ordinary American translator see a geographic relationship between Moskovskaya and Russian vodka? Well, first of all, my guess is that he would believe that it comes from Russia. Well, it says it on the label. It says it on the label. But we're concerned here, Your Honor, not with the label, but with the mark Moskovskaya, because the question is whether that mark itself can be registered. If we were talking about a label mark, such as the one you described, that would be a different case, right? Would you agree that if the vodka here were, in fact, made in Dover, Delaware, that the label would be, that the mark would be geographically deceptive? I would like to do a survey to find out. And on this record, it would be geographically deceptive, wouldn't it? I don't think it necessarily would, Your Honor, because, again, this R-survey shows that only six of the respondents knew what Moskovskaya meant, knew that it was related to Russia. But a very large proportion thought it came from Russia, right? Well, yes. But if they thought it came from Russia and it came from Dover, Delaware, I would agree that that would be a problem at the large proportion. But here we have the situation where our product, in fact, does come from Russia. So the fact that a lot of people thought it came from Russia does not show that they were deceived. One other point, if I may make, I don't know how much time I have left, but the Board has taken the position that the relevant group are those people who speak the foreign language. And their findings that all three of the California innovations conditions are met are based on that assumption. They found their holdings that the second and third conditions of California innovations were met was based on two things. One, their finding that Moscow is known for vodka and number two, that those consumers who speak Russian would know that Moskovskaya means from Moscow and that they would therefore have a draw connection and maybe think that the vodka came from Moscow. But there is no evidence in the record, none, that those consumers who do not speak Russian would know that Moskovskaya means from Moscow. And without such evidence, the Board's finding that Moscow is known for vodka would be irrelevant as to those consumers because they would have no goods place association with Moscow in the first place if they don't understand that it means from Moscow. And secondly, without any evidence that 99% of the relevant consumers, and I'm now including all relevant consumers, according to the survey, non-Russian speaking people in the United States are constituting 99.75%. Without evidence that that kind of a percentage of vodka consumers know that Moskovskaya means from Moscow, there is no basis in this record, there's no evidence in this record that they, if you look at the entire universe, that they would be likely to believe that the vodka comes from Moscow. And there is no evidence in the record that they would be likely to care if they found that it came from Kaliningrad. The only evidence in the record, the evidence that the Board relied on is based on the assumption that the Russian speakers would know that Moskovskaya means from Moscow. If you look at the entire universe, there's no evidence that those speakers would know that it means from Moscow, and no evidence that they would be deceived. There's none. Thank you. Спасибо, дорогие коллеги. Мы закончили сегодня.